355 A.2d 718.

GREATER PROVIDENCE TRUST COMPANY *vs.*
NATIONWIDE MUTUAL FIRE INSURANCE COMPANY.

APRIL 14, 1976.

PRESENT: Roberts, C. J., Paolino, Joslin and Kelleher, JJ.

KELLEHER, J. This is a suit concerning a fire insurance policy. It is before us on the plaintiff's appeal from a judgment entered in the Superior Court for the defendant, Nationwide Mutual Fire Insurance Company (Nationwide), after a jury-waived trial.

Apex Realty, Inc. (Apex) d/b/a Apex Auto Body, Inc. owned a four-unit apartment house located at 433 Washington Street in the town of Coventry. The apartment house and a next-door garage, which served as the headquarters of Apex's auto body business, were subject to a first mortgage of $35,000 held by Centreville Savings Bank and a second mortgage of $16,641.91, which had been given by Greater Providence Trust Company (Greater Providence). The first mortgage was issued on June 4, 1969, and thereafter, in September 1970, Nationwide issued its fire policy on the apartment house property designating Centreville as the mortgagee. Greater Providence's mortgage was executed and recorded on October 19, 1970. The

repair shop and apartment house were located on separate but contiguous parcels of real estate. The shop's address was 439 Washington Street.

On September 23, 1971, a fire destroyed a portion of the apartment house. Nationwide paid the fire loss by issuing a draft dated Novmber 1, 1971, to Apex for $16,492. Shortly after this payment Apex went into receivership and subsequent developments explain the involvement of Greater Providence. The controversy in this appeal centers around the contention that Nationwide under the policy should have paid the mortgagee, Centreville Savings Bank, instead of Apex.

In May 1972, Greater Providence, having received the approval of the Superior Court, foreclosed its mortgage. After successfully acquiring the property with a $4,000 bid, the mortgagee's deed was recorded in June. On July 26 Centreville transferred its mortgage and note to the Greater Providence Deposit Corporation for a consideration of $33,681.43. The deposit corporation was described by its executive vice president as a holding company that owns all the stock in the trust company. On August 1 Centreville assigned all its interest in its fire claim to the deposit corporation. Later, the corporation assigned its rights under the policy to the trust company.

On August 17, 1972, Greater Providence made a demand upon Nationwide for payment of the $16,492 which it claimed should have been paid to Centreville. Thereafter, discussions ensued between Greater Providence's attorney and Nationwide's district claims manager. On September 22, 1972, the manager met with one of Nationwide's attorneys, who, in discussing the claim, pointed out that the 1-year period following the fire in which all claims must be brought under the policy would expire the next day. When Greater Providence's attorney called the claims manager in early October, the manager pointed to the

policy and the 1-year stipulation. The attorney, after being informed that there would be no settlement, commenced this suit.

The trial justice, in finding for the defendant, relied upon the 1-year contractual limitation and further ruled that Nationwide was not estopped from asserting this defense. The policy issued by Nationwide contains what is known in the insurance trade as a "standard" mortgagee clause. The inclusion of such a clause is mandated by G. L. 1956 (1968 Reenactment) §§27-5-2 and 27-5-3 and creates two separate contracts, one between the mortgagor and the insurer and the other between the mortgagee and the insurer. *Old Colony Co-operative Bank* v. *Nationwide Mut. Fire Ins. Co.*, 114 R. I. 289, 292, 332 A.2d 434, 436 (1975); *Greater Providence Trust Co.* v. *Nationwide Mut. Fire Ins. Co.*, 114 R. I. 926, 332 A.2d 784 (1975).

The fact that the policy contains two separate contracts, however, is of no help to Greater Providence. Since its claim emanates from the policy, we look to its provisions which in clear, precise, and all-encompassing language state that "[n]o suit or action on this policy for the recovery of any claim shall be sustainable in any court of law or equity unless all the requirements of this policy shall have been complied with, and unless commenced within twelve months next after inception of the loss." This policy also stipulates that if the insured fails to render proof of loss, the mortgagee, upon notice, shall render proof of loss within 60 days thereafter and shall be subject to the provisions relating to appraisal, *time of payment, and of bringing suit*. While Greater Providence claims that the dual contract concept frees it from the 1-year proviso, it cites no case which supports this position.

To the contrary, courts which have considered policies containing the identical language to which we have just

referred have ruled that both the owner and the mortgagee are bound by the limitation period set forth in the policy. *Blanton* v. *Northwestern Nat'l Ins. Co.*, 335 F.2d 965, 969 (9th Cir. 1964); *Sterling Savings & Loan Ass'n* v. *Reserve Ins. Co.*, 63 Ill.App.2d 220, 222, 211 N.E.2d 412, 415 (1965); *Miners Sav. Bank* v. *Merchants Fire Ins. Co.*, 131 Pa.Super. 21, 27, 198 A. 495, 498 (1938); *see also* 20A Appelman, *Insurance Law* §11616 at 12 (1963 ed.); 18 Couch, *Insurance* §75.43 at 733 (Anderson 2d ed. 1968). We are dealing with a uniform, standard form of policy provision, and we can see no reason why the plain language of the policy should receive a construction which differs from that it has received in other jurisdictions. Greater Providence, as assignee of Centreville, was bound by the policy to commence suit within the 12-month period following the fire.

Notwithstanding the application of the 1-year limitation, Greater Providence argues with great vigor that Nationwide's creation of a "settlement atmosphere" should estop the insurer from relying on this provision. In support of this theory, Greater Providence points to the fact that at some point in their discussions the claims manager failed to abide by his promise that he would furnish the attorney with a copy of the policy. Moreover, Greater Providence contends that once the insurer discovered that the 1-year period was about to lapse, it should have informed Greater Providence that the claim would not be settled. We do not agree with these contentions.

Mere negotiations between the insurer and a claimant cannot alone justify the application of estoppel. If so, settlement negotiations would be frustrated and impeded. *Peloso* v. *Hartford Fire Ins. Co.*, 102 N.J.Super. 357, 369, 246 A.2d 52, 59 (1968). Therefore, these negotiations will not amount to estoppel unless they are accompanied by certain statements or conduct "* * * calculated to lull the

claimant into a reasonable belief that his claim will be settled without suit." *Flagler* v. *Wessman,* 130 Ill. App. 2d 491, 494, 263 N.E.2d 630, 632 (1970). *See Shea* v. *Gamco, Inc.,* 81 R. I. 12, 17, 98 A.2d 864, 867 (1953); *Lee* v. *City & County of Denver,* 29 Colo.App. 256, 261-62, 482 P.2d 389, 392 (1971); *Knight* v. *Lawrence,* 331 Mass. 293, 295, 118 N.E.2d 747, 748 (1954). *See generally,* Annot., 39 A.L.R.3d 127 (1971); Annot., 29 A.L.R.2d 636 (1953).

While the circumstances and facts of each case play an important part in applying the test to which we have just referred, most courts usually will not find an estoppel unless at least one of the following situations is present: (1) the insurer by his actions or communications has assured the claimant that a settlement would be reached, thereby inducing a late filing, *W. P. Hamblin, Inc.* v. *Newark Fire Ins. Co.,* 48 R. I. 473, 139 A. 212 (1927); *Schaefer* v. *Kerber,* 105 Cal.App.2d 645, 234 P.2d 109 (1951), *see* Annot., 29 A.L.R.2d 636, 658-61 (1953), or (2) the insurer has intentionally continued and prolonged the negotiations in order to cause the claimant to let the limitation period pass without commencing suit. *Shea* v. *Gamco, Inc., supra; Triple Cities Constr. Co.* v. *Maryland Casualty Co..* 4 N.Y.2d 443, 449-50, 151 N.E.2d 856, 859 176 N.Y.S.2d 292, 296 (1958), *see* cases collected in 39 A.L.R.3d 127, 140 n. 3 (1971). Neither of these situations is present in this controversy.

The claims manager testified that he contacted the vice president of Centreville Savings on May 19, 1972, and asked him if the bank was going to file a proof of loss. According to the manager, the vice president replied that the bank would hold off on any filing because Greater Providence was going to take over the first mortgage and he expected the bank would be paid off in full. The vice president conceded that in talking with the manager he

might have said, "I'm going to wait and take our payment [out] of the sale; there's enough equity there." The vice president also conceded that in transferring its mortgage, it was paid in full by Greater Providence. Once the transfers were completed, Greater Providence entered into a lease-purchase agreement whereby a trucking company agreed to buy the mortgaged premises for $47,500.

Actually, there was little difference in the testimony offered by Greater Providence's attorney and the claims manager relative to the content of their conversations with each other. As noted earlier, Greater Providence's August 1972 demand letter asked for the full $16,000. Thereafter, the attorney and the manager had several discussions. Throughout the discussions the manager took the position that if Nationwide paid, it would insist that Greater Providence assign its interest in the first mortgage to the insurer. This insistence caused a difference of opinion as to whether or not the policy conferred such a right on Nationwide.[1] The manager, in light of the $47,500 lease-purchase agreement, took the position that the trust company's actual loss would be negligible. Admittedly, Greater Providence's demand figures were lowered as negotiations continued on after mid-September, but the 1-year period ran out in the meantime. The trial justice, in making his findings of fact, aptly described the ongoing discussions between Nationwide and Greater Providence as, at most, a "probing" by the trust company without any "commitment" from the insurer.

An insurer may be estopped when it wrongfully or unjustifiably withholds the policy from an insured. *Heezen* v. *Hartland Cicero Mut. Ins. Co.*, 63 Wis.2d 449, 454, 217 N.W.2d 272, 275 (1974). But here there is no evidence which would support a belief that Nationwide attempted

---

[1]See Appendix.

to hoodwink the trust company by an intentional withholding of the policy. In fact the claims manager admitted that the fulfillment of his promise to supply a copy of the policy was delayed by his mandatory attendance during the week following their conversation at an instruction course on the latest developments in the fire insurance business conducted by his employer at an out-of-state location. Anyway, there was evidence that at this time Centreville had given its copy of the policy to the trust company.

At the trial it was also disclosed that Greater Providence had purchased from Lloyd's of London a blanket type fire insurance policy that covered any property upon which the trust company held a mortgage. The Superior Court records indicated that on September 22, 1972, Greater Providence had commenced suit against Lloyd's for the Apex loss. The trial justice specifically found that this suit was an indication that Greater Providence was well aware of its obligation to bring suit within the 1 year.

If an insured (or in this case the mortgagor's assignee) relies upon estoppel to avoid the consequences of noncompliance with the 1-year limitation provision of the policy, he must prove the misleading conduct of the insurer and his reliance on that to his detriment. *Ottendorfer* v. *Aetna Ins. Co.*, 231 A.2d 263, 265 (Del. Sup. Ct. 1967). Here the trust company has failed to sustain its burden. We have reviewed the record and find no reason to fault either the trial justice's findings of fact or his conclusions of law.

The plaintiff's appeal is denied and dismissed.

Mr. Justice Doris did not participate.

### *Appendix*

The pertinent portion of the mortgage clause reads as follows: "C. Mortgage Clause: * * * Loss, if any, under

this policy, shall be payable to the mortgagee * * * named on the first page of this policy, as interest may appear under all present or future mortgages upon the property herein described in which the aforesaid may have an interest as mortgagee * * * this insurance as to the interest of the mortgagee * * * shall not be invalidated by any act or neglect of the mortgagor or owner of the within described property, nor by any foreclosure or other proceedings or notice of sale relating to the property, nor by any change in the title or ownership of the property, nor by the occupation of the premises for purposes more hazardous than are permitted by this policy * * *.

"Whenever the Company shall pay the mortgagee * * * any sum for loss under this policy, and shall claim that, as to the mortgagor or owner, no liability therefor existed, the Company shall to the extent of such payment, be thereupon legally subrogated to all the rights of the party to whom such payment shall be made * * *or may at its option pay to the mortgagee * * * the whole principal due * * * on the mortgage, with interest accrued and shall thereupon receive a full assignment and transfer of the mortgage * * * but no subrogation shall impair the right of the mortgagee * * * to recover the full amount of said mortgagee's * * * claim."

*Adler, Pollock & Sheehan, Incorporated, Peter Lawson Kennedy, Stanley J. Kanter, George L. Chimento,* for plaintiff.

*John G. Carroll,* for defendant.